John Francis McSWEENEY

v.

UNITED STATES of America et al.

No. C 71–839.

United States District Court,
N. D. Ohio, E. D.

Dec. 21, 1971.

Rita Reuss, Asst. U. S. Atty., Cleveland, Ohio, for the United States.

Peter R. Harwood, of Benesch, Friedlander, Mendelson & Coplan, Cleveland, Ohio, for John Francis McSweeney.

## MEMORANDUM AND ORDER

CONNELL, Senior District Judge.

A complaint has been filed in this court seeking an order enjoining the above-named defendant from activating the petitioner into regular service in the United States Marine Corps for a period of fifteen months.

The petitioner, John Francis McSweeney, is twenty-seven years old, married, the father of a nineteen month old daughter, and the expectant father of another child. Also, Pvt. McSweeney's mother is a widow and his father-in-law is recovering from a heart attack, a broken hip and gangrene of both feet. The petitioner is now, and has been, employed for the past five years as a brakeman with the Newburgh and South Shore Railway in Cleveland, Ohio. It is also noted that McSweeney's activation for fifteen months is but one month from completion of the entire six year reserve obligation.

At the filing of this action, the petitioner was a private in the United States Marine Corps Reserve. The record shows that Private McSweeney enlisted in the Marine Corps Reserve on September 30, 1965. The record also shows that the petitioner enlisted for a period of six years, with a termination date of September 29, 1971. During the period of almost six years, the petitioner has served the required six months in active service, participated in six two-week summer camp periods and attended weekend drills during the enlistment period.

During the period of enlistment, the petitioner has attended 241 weekend drills, representing 95% drill attendance for the entire enlistment period, and for the last three years, 1968, 69 and 70, a perfect drill attendance record was compiled. The record shows that at the time of enlistment, the participant was required to attend not less than 90% of the required drills. In 1967, by order of the commandant, the 90% attendance requirement was changed. The requirement was then changed to prohibit all future unexcused absences from reserve drills.

The performance of Private McSweeney over the period of his enlistment consists of an overall average of 3.9 in general military subjects, and 3.7 in "conduct" and "duty." The records show that during the past six years, the petitioner has been in violation of Marine Regulations three times. The incidents concern playing cards while on duty, absence from sick bay during weekend drill, and missing a military bus during a layover en route to summer training camp. In each incident, the petitioner underwent the prescribed punishment.

While petitioner's record in the Reserves is not perfect, the record shows that the petitioner has participated in a satisfactory manner during his period of enlistment. In December, 1968, Private McSweeney was nominated for involuntary active duty, however, the Commandant of the Marine Corps failed to approve the nomination.

The record shows that petitioner was absent from drills on the weekend of April 24–25, 1971. At this time, the petitioner was sick with the flu. After sixteen days, the petitioner presented to the Marine Corps, a doctor's statement concerning the illness. This excuse was confirmed by telephone conversation between the Marine Corps and the petitioner's doctor. Although the Marine Corps did not accept the petitioner's med-

ical excuse, for reasons of their own, the petitioner was afforded the opportunity to perform the equivalent instruction, and this was performed satisfactorily on the weekend of May 22 and 23, 1971.

On the weekend of May 8 and 9, 1971, the petitioner also failed to attend the reserve meetings as required due to an illness. The petitioner failed to present an excuse as to his absence, and was denied the opportunity to perform equivalent instruction, although McSweeney was willing and prepared to do so.

At this time, the Battalion Commander, Lt. Col. G. A. Dickerson, informed Private McSweeney by letter that he would be nominated for involuntary active duty due to his unsatisfactory participation. Upon receipt of this letter of June 5, 1971, McSweeney asked to speak to Captain Henderson, the Assistant Inspector Instructor. Captain Henderson, not being available at his office, McSweeney called Henderson at his home by telephone. Captain Henderson would not speak to McSweeney at home, and told McSweeney he was available at his office at headquarters.

In June, Company Commander, Marc H. Glasgow, informed the plaintiff that the reservist was an unsatisfactory participant and that he was nominated for involuntary active duty. Captain Glasgow, his Company Commander, made the initial recommendation that McSweeney be nominated for involuntary active duty on June 12, 1971. The recommendation was made to Lt. Col. Dickerson on the basis of Captain Glasgow's determination that McSweeney was an unsatisfactory participant, due to the missed drills of May 8–9, and the marine's overall record. Glasgow testified that on June 12, 1971, he informed McSweeney he had a chance to submit in writing a reason why he did not make the May meeting. McSweeney, not having submitted an excuse, Glasgow informed the marine of the right to "request mast", which procedure was not exercised.

In an attempt to gain reconsideration of the nomination to involuntary active duty, McSweeney contacted Congressmen Minshall, Vanik and Stanton. These congressmen wrote McSweeney and informed him that inquiry was being made into this matter. Upon receipt of Congressman Minshall's letter by McSweeney, there is included a copy of a letter sent to Congressman Minshall from the U. S. Marine Corps dated August 16, 1971, stating McSweeney's status in regard to the present matter. The letter from the Marine Corps is clearly erroneous in that it states McSweeney missed a drill on April 24 and 25, but never mentioned that this drill was made up with equivalent instructional duty, nor does it state that McSweeney was sick and produced a medical certificate to that effect. Rather, this letter to Congressman Minshall emphatically states that McSweeney was afforded the opportunity to make up the absence of April 24 and 25, and that the petitioner chose not to perform the equivalent instructional duty. This same letter from the Marine Corps was sent to Congressman Stanton, and it contained the same mistakes. These letters were sent at a time when all this information was available to the Marines. The letter sent to Congressman Minshall is signed by the Deputy Director of the Marine Corps Reserve, Colonel J. A. MacNeil. The letter sent to Congressman Stanton is dated August 18, 1971, and is signed by General R. G. Davis, United States Marine Corps, Acting Commandant of the Marine Corps.

The Commanding Officer, Marc Glasgow, described as being "gung ho", hammered the witness stand continually with his hands until this court requested him to stop. Capt. Glasgow testified that his recommendation for activation was based upon the petitioner's overall service record. In the operations of the Marine Corps Reserve, this Commanding Officer must determine whether a person will be excused or not from drills, and if excused, whether he will be allowed or required to make up a missed drill. After a decision is made by the Commanding Officer, and if activation is so determined, he then forwards his recommenda-

tion. It is pointed out that McSweeney was not activated involuntarily for fifteen months because of poor performance, but because he did not attend required training periods.

The procedure involving the nomination to involuntary active duty involved several considerations. The Commanding Officer of the individual makes the first recommendation, and then it proceeds upward to the Battalion Commander. Depending upon the decision of Battalion, it may then move on to the Marine Corps District. From District, depending upon the decision, the recommendation then proceeds to Division of Reserve Headquarters, Marine Corps, Personnel Management Branch. At this point the Board makes its decision in accordance with three basic guidelines. The Personnel Branch determines if they have available all the major facts, also that the rights of the "accused" are protected, and that the nomination procedure is administratively correct. It is noted that sometimes the board calls the reservist himself or the individual's unit to make sure of the reservist's entire situation. In the nomination procedure, the board considers the reservist's record book; the performance markings and records, the marital status of the marine, and his type of regular employment. Also, on the basis of the reservist's individual records, the board considers whether the activation would involve a hardship. The board states that all the records pertaining to McSweeney were considered in detail. Captain Glasgow, McSweeney's Commanding Officer, from whom the recommendation originated, did not know, nor attempt to find out the present status and possible hardship problems that might exist. Captain Glasgow, in considering McSweeney's family responsibilities did not know that McSweeney's wife was pregnant, nor did Glasgow find out until after McSweeney's orders were submitted in August. Also, no attempt was made by Captain Glasgow to find out what McSweeney's present status was at this time, either by asking McSweeney himself, the sergeant in charge of the record-keeping procedure, or anyone else.

In the reserve program, a service record book is kept on each marine. Once a year, in the reserves, a personnel questionnaire form containing the marine's name, rank, address, social security number, and the date of expiration of obligated service is presented to the reservist by the Marine Corps. Once a year, at this time, each reservist has his record "audited." This "audit" means an individual reads through his record book and checks for any discrepancies that might exist concerning the marine's education, dependency status and hardship status. This is done by the individual himself with the assistance of the marine personnel and is written in pen, signed and dated. Usually, this procedure is done once a year on the man's anniversary month of enlistment. The last time this procedure was completed by Pvt. McSweeney, was September 13, 1970, almost an entire year prior to the issuance of the order of activation.

In August of this year, Private McSweeney discussed with Sergeant Wallace the possibility of a hardship discharge. At that time, Sergeant Wallace and Staff Sergeant Briggs were present. At this time Private McSweeney requested the necessary papers, forms, information and steps to be taken in the filing of this discharge. McSweeney later called Sergeant Wallace, and the sergeant informed him that the application must be filed at Camp Lejeune, since McSweeney was under orders to report there to involuntary active duty for fifteen months. At this meeting with Sergeants Wallace and Briggs, McSweeney was counselled by Wallace, and copies of some of the necessary information from the manual were given to McSweeney. On August 31, 1970, Captain Anderson and Sergeant Wallace appeared at Pvt. McSweeney's home, and presented to him the orders to serve fifteen months of involuntary active duty in the Marine Corps. At this time, McSweeney informed Wallace that he had most of the necessary letters to submit for a hardship discharge.

In this pending action, the petitioner attacks these activation orders of August 13, 1971, and to these issues this court will address itself.

■ The jurisdiction of a federal court in reviewing the activities of the military is very limited. The discretion of the military personnel is not one in which this court can substitute its judgment. See Winters v. United States, 281 F.Supp. 289 (E.D.N.Y.1968).

■ However, in instances where the decisions of the military are governed by the laws of Congress, these cannot go without notice, and sufficient allegations as to their violations gives the federal court the power to conduct review. See Smith v. Resor, 406 F.2d 141 (2d Cir. 1969).

This action has been filed, alleging violations of 10 U.S.C. § 673a(c) (1), and Executive Order No. 11366.

Section 673a(c) specifically states:

"To achieve fair treatment among members of the Ready Reserve who are being considered for active duty under this section, appropriate consideration shall be given to—

(1) family responsibilities;"

■■ In this instance, the military is bound by this law and such must be given careful weight in the issuance of orders for involuntary active duty. Schatten v. United States, 419 F.2d 187 (6th Cir. 1969), Hollingsworth v. Balcom, 441 F.2d 419 (6th Cir. 1971). In the case before this court, it is clear that the petitioner was activated for his absence from the drills of May 8 and 9. It can be clearly observed from the undisputed testimony that the fact that Pvt. McSweeney's wife was pregnant at that time was unknown to Captain Marc Glasgow when he nominated the petitioner for active duty. This fact also was unknown to the Review Board in Washington, D. C. The Marine Corps maintains records of this individual, and the McSweeney records were current as of September, 1970. Here, it is manifest that the records used by the Review Board were almost one year old at the time they were reviewed in Washington, and they did not contain the fact of the pregnancy. In the nominating procedure, this question of the petitioner's current status and family responsibilities was never considered. The Company Commander, Marc Glasgow, in reviewing the petitioner's records did not have before him an accurate account of the petitioner's records, when such could have easily been obtained. There is also testimony concerning the mother and the illness of the father-in-law of this individual which might have had bearing upon this most crucial decision. This also was neither included, nor considered, nor was any attempt made to find out. While it is noted that the Review Board in Washington frequently refers records back to the headquarters for further information which will give exactitude to their decision making, such was not done in this case. On occasion, the Review Board in Washington calls the reservist himself or the unit; in this case, it did neither. Rather, the records concerning family responsibilities were nearly one year old, inaccurate, and no request of updating was made.

Whether, after the fact of nomination and activation, Glasgow felt that the pregnancy would have made no difference in his decision is of no value, in light of the word "appropriate." See 10 U.S.C. § 673a(c). The Company Commander is not the Board of Review, and consequently does not make the decision and issue the orders. The Board in Washington, D. C. considers the question of the pregnant wife in making its decision, and in this instance, such current problems were not before the Board, consequently "appropriate" consideration was not given, thus depriving the petitioner of fair treatment within the meaning of 10 U.S.C. § 673a(c). Consideration of family responsibilities by the board after the fact of activation cannot rehabilitate the inappropriateness of the proceeding in the first instance.

It is pointed out that the Marine Corps claims to have re-reviewed the question of pregnancy in the McSweeney

case. This request was made after the initiation of the lawsuit and at the request of the assistant U. S. Attorney. At no time during this second review did the board attempt to contact McSweeney, nor did the board attempt to have McSweeney update his current file which was one year old at the time. Furthermore, the question of McSweeney's request for a hardship discharge and the accompanying letters to that effect were neither before the board nor considered on the second occasion. This situation was due to the misinformation given to McSweeney by the Marine Corps itself. The second review did not have before it the attendant facts and also failed in its consideration of McSweeney's family responsibilities. This court finds that this second review was also remiss in its considerations, inappropriate, and consequentially, contrary to its dictate of fairness prescribed by 10 U.S.C. § 673a(c) (1).

■ It is further pointed out that the Marine Corps Separations and Retirement Manual, Section 6014(2), requires the service to inform and assist a member in the preparation of dependency or hardship discharge. In this instance, information was supplied; however, the information concerning submission was incorrectly given. Nowhere does this Section 6014, or any other section state that the reservist is required to submit such hardship discharge at the base to which he is ordered to report. This misinformation has prevented the petitioner from having the question of discharge presented to the Marine Corps for consideration by the Board of Review or any other board, and has negated the meaning and intent of the regulation.

It must also be noted here that a situation whereupon the Marine Corps misinforms two United States Congressmen concerning a most important matter as this is a deplorable situation. Whether, by oversight or carelessness, the result is to prejudice a critical matter and deprive an individual of a most fundamental right. Two letters, one signed by a Colonel, Deputy Director, and the other signed by a General, Acting Commandant of the Marine Corps, both containing serious mistakes having critical bearing on this matter is severely prejudicial and exemplifies the same lack of exactitude and inadvertence that has characterized this entire proceeding.

This court finds that the defendant has failed to conform with the provisions of Section 673a(c) and (c) (1) of Title 10 U.S.C., and further, this court finds that the defendant has failed to conform to Section 6014(2) and (6) of the Marine Corps Separation and Retirement Manual.

In accordance, a permanent injunction shall issue enjoining the Marine Corps from activating the petitioner, and the order to report to involuntary active duty issued to the petitioner be and is hereby cancelled and rendered of no effect.

It is so ordered.